**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

E-ALTERNATIVE SOLUTIONS, LLC,

Plaintiff,

v.

UNITED STATES OF AMERICA; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; ROBERT E. LIGHTHIZER, U.S. TRADE REPRESENTATIVE; U.S. CUSTOMS & BORDER PROTECTION; MARK A. MORGAN, U.S. CUSTOMS & BORDER PROTECTION ACTING COMMISSIONER,

Defendants.

Case No. 20-00679

**COMPLAINT**

Plaintiff, E-Alternative Solutions, LLC ("EAS"), by and through its undersigned counsel, alleges and states as follows:

**INTRODUCTION**

1. This action concerns Defendants' prosecution of an unprecedented, unbounded, and unlimited trade war impacting over $500 billion in imports from the People's Republic of China. This Complaint challenges Defendants' unlawful escalation of that trade war through the imposition of a third round of tariffs on products covered by the so-called "List 3" tariffs: *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 47,974 (Sept. 21, 2018). Among the affected products are the electronic nicotine delivery system products imported by EAS.

2. The Trade Act of 1974 ("Trade Act") did not confer unlimited authority to Defendants to impose duties or tariffs on a foreign country to eliminate the unfair act, policy, or

practice of a foreign country. 19 U.S.C. § 2411. Rather, the Trade Act constraints the Defendants' power both substantively—by requiring that the action be "equivalent in value to the burden or restriction being imposed by that country on United States commerce"—and procedurally—by setting the time in which Defendants are required to act. 19 U.S.C. §§ 2411(a)(1), (3), 2414. Any modification or termination of any action taken under Section 2411 of the Trade Act must be limited to circumstances where

> (A) any of the conditions described in section 2411(a)(2) of this title exist,
>
> (B) the burden or restriction on United States commerce of the denial rights, or of the acts, policies, and practices, that are the subject of such action has increased or decreased, or
>
> (C) such action is being taken under section 2411(b) of this title and is no longer appropriate.

19 U.S.C. § 2417(a)(1). There are limits to the Defendants' authority under the statute that must be preserved, and which Defendants exceeded in this case.

3. The United States Trade Representative ("USTR") commenced an investigation into China's unfair intellectual property policies and practices pursuant to Section 301 of the Trade Act (19 U.S.C. § 2411). Section 304 of the Trade Act (19 U.S.C. § 2414) required USTR to determine what action to take, if any, within 12 months after initiation of that investigation. But USTR failed to issue List 3 within that window.

4. The "modification" authority under Section 307 of the Trade Act (19 U.S.C. § 2417) does not give the Defendants complete freedom to do whatever USTR chooses under the guise of eliminating China's unfair intellectual property practices. Section 307 of the Trade Act does not permit USTR to expand the scope of the imposition of tariffs to other imports from China

for reasons unrelated to the acts, policies, or practices that USTR originally investigated under Section 301 of the Trade Act. Rather, the "modification" authority is constrained by the limits of the authority vested under Section 301 of the Trade Act.

5. Defendants, however, promulgated the List 3 duties in response to China's retaliatory duties and other unrelated issues.

6. Even if USTR deemed the existing tariffs "no longer appropriate," as it also did here, the Trade Act only permits USTR to modify or terminate the actions it has already taken within the constraints of Section 301 of the Trade Act.

7. The arbitrary manner in which Defendants implemented the List 3 tariffs also violates the Administrative Procedure Act ("APA"). The APA prohibits agency actions that are "arbitrary," "capricious," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). USTR violated the APA through its promulgation of the List 3 tariffs in at least three distinct ways:

(1) USTR failed to provide sufficient opportunity for comment as mandated by section 307 of the Trade Act for each modification by, *inter alia*, requiring interested parties to submit affirmative *and* rebuttal comments on the same day for USTR's imposition of additional duties under List 3*;*

(2) USTR failed to consider relevant factors when promulgating the tariffs, e.g., undertaking no analysis of the supposed "increased burden" imposed on U.S. commerce from the unfair intellectual property policies and practices that USTR originally investigated; and

(3) USTR failed to connect the record facts to the choices it made. Indeed, despite receiving over 6,000 comments for List 3, USTR said absolutely nothing about how those comments shaped its promulgation of List 3. USTR's preordained promulgation and modifications of List 3 violates the APA's demands.

8. The Court should set aside Defendants' actions as *ultra vires* and otherwise contrary to law, as well as order Defendants to refund (with interest) all duties paid by EAS pursuant to List 3.

9. EAS, an independent and family-owned innovator of consumer-centric brands, imports numerous entries of electronic nicotine delivery system (ENDS) device parts and components classified under HSTUS subheadings 8543.90.8850 and 8543.90.8860, which are covered under List 3.

10. ENDS products are considered to be "tobacco products" under the Federal Food, Drug & Cosmetics Act ("FDCA"). Under the FDCA, no new ENDS products are allowed to be commercially marketed in the United States absent a premarket authorization from the U.S. Food and Drug Administration ("FDA"), which requires the expenditure of millions of dollars to complete. Under FDA's enforcement policy, the only ENDS products that can currently be sold in the U.S. are those that already were on the market as of August 8, 2016, and for which a premarket application has been submitted to FDA. If an ENDS supplier were to use a different ingredient, additive, component, or material in the production of the product, the product would constitute a "new tobacco product," and the manufacturer would be required to file a new premarket authorization application under the FDCA. Thus, the manufacture and sale of any new or modified ENDS devices or parts in the United States are effectively banned in the United States.

11. EAS has been at the forefront of ensuring that its branded vapor products are marketed and distributed for the protection of public health and has been advocating for ending youth access to ENDS products. It has invested millions of dollars to apply for the premarket authorization for its branded ENDS products that were on the market as of August 8, 2016, but must continue to rely on Chinese imports for a continuous supply of the parts and components for these products.

12. The government's import data since 2017 demonstrates that Chinese imports of ENDS parts classified under 8543.90.8850 have represented from 96.32% to 99.97% of the global

imports into the United States by value. The Chinese manufacturer of the proprietary Leap® pods sold by EAS is the sole manufacturer for these components. If EAS were to relocate its supply of these parts and components for its ENDS products, EAS would be required to apply to FDA for new marketing orders for these products. It is nearly impossible to replicate manufacturing operations for these components outside of China.

13. As such, EAS applied for narrowly tailored exclusions from the additional duties imposed by List 3, including for (i) its Leap® pods, which are filled with nicotine-containing e-liquids and classified under 8543.90.8860; (ii) its Leap® device kits (which are incomplete ENDS assemblies to be used with Leap® pods to form a complete ENDS device) classified under 8543.90.8850, and (iii) its proprietary non-nicotine-containing Leap® pods classified under 8543.90.8850.

14. EAS submitted that it would incur millions of dollars of expenses in absorbing the tariff and could lose a substantial portion of its sales if it were to increase prices to cover the cost of the tariff.

15. Despite the foregoing, Defendants ignored the record evidence establishing that the ENDS components imports are not available in the U.S. market, and instead issued a boilerplate denial to each and every one of EAS's exclusion requests that failed to address any of the record evidence and failed even to offer any reasoned basis for Defendants' decisions. As a result, EAS has paid millions of dollars in tariffs from which it could have been exempted. Defendants effectively abandoned the standards established in their own exclusion procedures, thereby depriving EAS of its right to due process and fair treatment. In short, in violation of the APA's requirements, Defendants' actions were arbitrary, capricious, and an abuse of discretion and should be held unlawful and set aside by this Court. *See* 5 U.S.C. § 706.

## JURISDICTION

16. The Court possesses subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(i)(1)(B), which confers "exclusive jurisdiction" to the Court over "any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . . tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue." 28 U.S.C. § 1581(i)(1)(B).

## PARTIES

17. Plaintiff EAS is a family-owned importer and distributor of vaping devices and components. EAS employs some 45 individuals in the United States and generates millions of dollars in revenue annually. EAS has made numerous entries of delivery system (ENDS) device parts and components classified under HSTUS subheadings 8543.90.8850 and 8543.90.8860 covered under List 3, which are subject to the additional *ad valorem* duties under List 3.

18. Defendant United States of America received the disputed tariffs and is the statutory defendant under 5 U.S.C. § 702 and 28 U.S.C. § 1581(i)(1)(B).

19. The Office of the USTR is an executive agency of the United States charged with investigating a foreign country's trade practices under Section 301 of the Trade Act and implementing "appropriate" responses, subject to the direction of the President. USTR conducted the Section 301 investigation at issue and made numerous decisions regarding List 3.

20. Ambassador Robert Lighthizer currently holds the position of USTR and serves as the director of the Office of the USTR. In these capacities, he made numerous decisions regarding List 3.

21. Defendant U.S. Customs & Border Protection ("CBP") is the agency that collects duties on imports. CBP collected payments made by Plaintiff to account for the tariffs imposed by USTR under List 3.

22. Defendant Mark A. Morgan is the Acting Commissioner of CBP. In this capacity, he oversees CBP's collection of duties paid by Plaintiff under List 3.

**STANDING**

23. EAS has standing to sue because it is "adversely affected or aggrieved by agency action" within the meaning of the APA. 5 U.S.C. § 702; *see also* 28 U.S.C. § 2631(i) ("Any civil action of which the Court of International Trade has jurisdiction . . . may be commenced in the court by any person adversely affected or aggrieved by agency action within the meaning of Section 702 of title 5."). The tariffs imposed by Defendants pursuant to List 3 adversely affected and aggrieved EAS because it was required to pay these unlawful duties.

**TIMELINESS OF THE ACTION**

24. A plaintiff must commence an action under 28 U.S.C. § 1581(i)(1)(B) "within two years after the cause of action first accrues." 28 U.S.C. § 2636(i).

25. The instant action contests actions taken by Defendants that resulted in the promulgation of List 3. *See Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 83 Fed. Reg. 47,974 (Sept. 21, 2018). Plaintiff's claims accrued, at the earliest, on September 21, 2018, when USTR published its notice of List 3 in the *Federal Register.* This action is thus timely filed.

**RELEVANT LAW**

26. Section 301 of the Trade Act authorizes USTR to investigate a foreign country's trade practices. 19 U.S.C. § 2411(b). If the investigation reveals an "unreasonable or

discriminatory" practice, USTR may take "appropriate" action, such as imposing tariffs on imports from the country that administered the unfair practice. 19 U.S.C. § 2411(b), (c)(1)(B).

27. Section 304 of the Trade Act requires USTR to determine what action to take, if any, within 12 months after the initiation of the underlying investigation. 19 U.S.C. § 2414(a)(1)(B), (2)(B).

28. Section 307 of the Trade Act (in pertinent part) allows USTR to "modify or terminate" an action taken pursuant to Section 301 of the Trade Act either when the "burden or restriction on United States commerce" imposed by the investigated foreign country's practice has "increased or decreased" or when the action "is no longer appropriate." 19 U.S.C. § 2417(a)(1)(B), (C).

29. Section 307 of the Trade Act further provides that "[b]efore taking any action under paragraph (1) to modify or terminate any action taken under section 2411 of this title, the Trade Representative shall consult with the petitioner, if any, and with representatives of the domestic industry concerned, and shall provide opportunity for the presentation of views by other interested persons affected by the proposed modification or termination concerning the effects of the modification or termination and whether any modification or termination of the action is appropriate." 19 U.S.C. § 2417(a)(2).

30. The APA prohibits agency actions that are "arbitrary" or "capricious," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

31. The APA requires agencies to comply with various procedural requirements when issuing new "substantive" or "legislative" rules. 5 U.S.C. § 553. These procedural requirements generally include a "notice of proposed rule making . . . published in the Federal Register," and an

opportunity for "interested persons" to submit "written data, views, or arguments." 5 U.S.C. § 553(b)-(c); *Parkdale Int'l, Ltd. v. United States*, 31 C.I.T. 1229, 1356 (Aug. 8, 2007). An agency is required to consider the comments it receives and publish a final rule together with a "statement of . . . basis and purpose" explaining the rationale for its decision. 5 U.S.C. § 553(c); *Parkdale Int'l* at 1356. Exceptions, however, exist for "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice," often called "interpretive rules." 5 U.S.C. § 553(b).

## PROCEDURAL HISTORY

### A. USTR'S INVESTIGATION

32. The current U.S.-China trade war grew from a narrow dispute. On August 14, 2017, President Trump directed Ambassador Lighthizer to consider initiating a targeted investigation pursuant to Section 301(b) of the Trade Act concerning China's laws, policies, practices, and actions related to intellectual property, innovation, and technology." *Addressing China's Laws, Policies, Practices, and Actions Related to Intellectual Property, Innovation, and Technology*, 82 Fed. Reg. 39,007 (Aug. 17, 2017). According to the President, certain Chinese "laws, policies, practices, and actions" on intellectual property, innovation, and technology "may inhibit United States exports, deprive United States citizens of fair remuneration for their innovations, divert American jobs to workers in China, contribute to our trade deficit with China, and otherwise undermine American manufacturing, services, and innovation." *Id.*

33. Four days later, on August 18, 2017, USTR formally initiated an investigation into "whether acts, policies, and practices of the Government of China related to technology transfer, intellectual property, and innovation are actionable under [Section 301(b) of] the Trade Act." *Initiation of Section 301 Investigation; Hearing; and Request for Public Comments: China's Acts,*

*Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 82 Fed. Reg. 40,213 (Aug. 24, 2017).

34. Seven months later, on March 22, 2018, USTR released a report announcing the results of its investigation. *See* Office of the United States Trade Representative, *Findings of the Investigation Into China's Acts, Policies, And Practices Related to Technology Transfer, Intellectual Property, and Innovation Under Section 301 of The Trade Act of 1974* (Mar. 22, 2018), *available at* https://ustr.gov/sites/default/files/Section%20301%20FINAL.PDF. USTR found that certain "acts, policies, and practices of the Chinese government related to technology transfer, intellectual property, and innovation are unreasonable or discriminatory and burden or restrict U.S. commerce." *Id. at* 17. USTR based its findings on (1) China's use of foreign ownership restrictions, foreign investment restrictions, and administrative licensing and approval processes to pressure technology transfers from U.S. to Chinese companies, *id.* at 45; (2) China's use of licensing processes to transfer technologies from U.S. to Chinese companies on terms that favor Chinese recipients, *id.* at 48; (3) China's facilitation of systematic investment in, and acquisition of, U.S. companies and assets by Chinese entities to obtain technologies and intellectual property for purposes of large-scale technology transfer, *id.* at 147; and (4) China's cyber intrusions into U.S. computer networks to gain access to valuable business information, *id.* at 171. In its report, USTR did not quantify the burden or restriction imposed on U.S. commerce by the investigated practices.

35. On the same date, USTR published a "Fact Sheet" stating that "[a]n interagency team of subject matter experts and economists estimates that China's policies result in harm to the U.S. economy of at least $50 billion per year." *See* Office of the United States Trade Representative, *Section 301 Fact Sheet* (Mar. 22, 2018), *available at* https://ustr.goviabout-us/policy-offices/press-office/fact-sheets/2018/march/Section-301-fact-sheet. USTR also indicated

that, consistent with a directive from President Trump, it would "propose additional tariffs" of 25% *ad valorem* "on certain products of China, with an annual trade value commensurate with the harm caused to the U.S. economy resulting from China's unfair policies." *Id.; see also Actions by the United States Related to the Section 301 Investigation of China's Laws, Policies, Practices, or Actions Related to Technology Transfer, Intellectual Property, and Innovation,* 83 Fed. Reg. 13,099 (Mar. 27, 2018) (President Trump's directive).

**B. TARIFF LISTS 1 & 2**

36. Between April and August 2018 (i.e., within the 12-month statutory deadline from the initiation of the investigation in August 2017, *see* 19 U.S.C. § 2414(a)(2)(B)), Defendants undertook a series of actions to remedy the estimated harm to the U.S. economy caused by the investigated unfair practices, ultimately imposing duties on imports from China covered by the so-called Lists 1 and 2.

37. On April 6, 2018, USTR published notice of its intent to impose "an additional duty of 25 percent on a list of products of Chinese origin." *Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 83 Fed. Reg. 14,906, 14,907 (Apr. 6, 2018). The products on the proposed list covered 1,333 tariff subheadings with a total value of "approximately $50 billion in terms of estimated annual trade value for calendar year 2018." *Id.* at 14,907. USTR explained that it chose $50 billion because that amount was "commensurate with an economic analysis of the harm caused by China's unreasonable technology transfer policies to the U.S. economy, as covered by USTR's Section 301 investigation." Office of the United States Trade Representative, *Under Section 301 Action, USTR Releases Proposed Tariff List on Chinese Products* (Apr. 3, 2018), *available at*

https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/april/under-section-301-action-ustr.

38. On June 20, 2018, USTR published notice of its final list of products subject to an additional duty of 25% *ad valorem*, a list commonly known as "List 1." *See Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 28,710 (June 20, 2018). USTR explained that it had "narrow[ed] the proposed list in the April 6, 2018 notice to 818 tariff subheadings, with an approximate annual trade value of $34 billion." *Id.* at 28,711.

39. At the same time that it finalized List 1, USTR announced that it intended to impose a 25% *ad valorem* duty on a second proposed list of Chinese products in order to "maintain the effectiveness of [the] $50 billion trade action" grounded in its Section 301 investigation. *Id.* at 28,712. USTR announced a proposed "List 2" covering 284 tariff subheadings with "an approximate annual trade value of $16 billion." *Id.* at 28,711-12.

40. On August 16, 2018, USTR published notice of the final list of products subject to an additional duty of 25% *ad valorem* in List 2, comprising "279 tariff subheadings" whose "annual trade value . . . remains approximately $16 billion." *Notice of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 40,823, 40,823-24 (Aug. 16, 2018).

**C. LIST 3**

41. As soon as USTR announced the results of its investigation in March 2018, tensions between the governments of China and the United States escalated dramatically. In the months that followed, Defendants wildly expanded the scope of the tariffs imposed under Section 301 of the Trade Act to cover imports worth more than $500 billion—ten times the amount it had deemed

"commensurate" with the findings of USTR's original investigation. Defendants did so for reasons untethered to the unfair practices that USTR had investigated, namely China's tit-for-tat countermeasures and a hodgepodge of grievances related to China's role on the world stage.

42. Shortly after President Trump directed USTR in April 2018 to consider imposing duties on $50 billion in Chinese products, China promptly threatened to impose retaliatory duties on the same value of imports from the United States. In response, President Trump "instructed the USTR to consider whether $100 billion of additional tariffs would be appropriate under Section 301" due to "China's unfair retaliation." *See* The White House, *Statement from Donald J. Trump on Additional Proposed Section 301 Remedies* (Apr. 5, 2018), *available at* https://www.whitehouse.gov/briefings-statements/statement-president-donald-j-trump-additional-proposed-section-301-remedies/.

43. When USTR finalized List 1 in mid-June 2018, President Trump warned China that he would consider imposing additional tariffs on Chinese goods if China retaliated against the United States. *See e.g.*, Vicki Needham & Max Greenwood, *Trump Announces Tariffs on $50 Billion in Chinese Goods,* The Hill (June 15, 2018), *available at* https://thehill.com/homenews/administration/392421-trump-announces-tariffs-on-50-billion-in-chinese-goods. ("The president said the United States will pursue additional tariffs if China retaliates 'such as imposing new tariffs on United States goods, services or agricultural products; raising non-tariff barriers; or taking punitive actions against American exporters or American companies operating in China.'").

44. Following through on his warning, on June 18, 2018, President Trump formally directed USTR to consider whether the United States should impose additional duties on products from China with an estimated trade value of $200 billion—despite USTR having not yet

implemented List 1 and List 2. President Trump acknowledged that China's threatened retaliatory "tariffs on $50 billion worth of United States exports" motivated his decision. The White House, *Statement from the President Regarding Trade with China* (June 18, 2018), *available at* https://www.whitehouse.gov/briefings-statements/statement-president-regarding-trade-china-2/ ("This latest action by China clearly indicates its determination to keep the United States at a permanent and unfair disadvantage, which is reflected in our massive $376 billion trade imbalance in goods. This is unacceptable.").

45. Acknowledging the purpose of the President's directive, USTR stated that it would design the newly proposed duties to address China's threatened retaliatory measures, rather than any of the harms identified in its Section 301 investigation. Office of the United States Trade Representative, *USTR Robert Lighthizer Statement on the President's Additional China Trade Action* (June 18, 2018), *available at* *https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/june/ustr-robert-lighthizer-statement-0* (explaining that, although Lists 1 and 2 "were proportionate and responsive to forced technology transfer and intellectual property theft by the Chinese" identified in the Section 301 investigation, the proposed duties for a third list of products were necessary to respond to the retaliatory and "unjustified tariffs" that China may impose to target "U.S. workers, farmers, ranchers, and businesses").

46. Despite these warnings from Defendants, China retaliated by imposing 25% *ad valorem* tariffs on $50 billion in U.S. goods implemented in two stages of $34 billion and $16 billion on the same dates the United States began collecting its own 25% tariffs under List 1 (July 6, 2018) and List 2 (August 23, 2018).

47. About a week after China imposed its first round of retaliatory duties, USTR published notice of its proposal to "modify the action in this investigation by maintaining the

original $34 billion action and the proposed $16 billion action, and by taking a further, supplemental action" in the form of "an additional 10 percent *ad valorem* duty on [a list of] products [from] China with an annual trade value of approximately $200 billion." *Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 33,608, 33,608 (July 17, 2018). USTR invoked Section 307(a)(1)(C) of the Trade Act, pursuant to which USTR "may modify or terminate any action, subject to the specific direction, if any, of the President with respect to such action, . . . if . . . such action is being taken under [Section 301(b)] of this title and is no longer appropriate." *Id.* at 33,609 (citing 19 U.S.C. § 2417(a)(1)(c)). USTR initially set a deadline of August 17, 2018, for initial comments; August 20-23, 2018, for a public hearing; and August 30, 2018, for rebuttal comments. *Id.* at 33,608.

48. In its notice, USTR confirmed that it had relied on China's decision to impose "retaliatory duties" as the primary basis for its proposed action. *Id.* at 33,609 (asserting as justification "China's response to the $50 billion action announced in the investigation and its refusal to change its acts, policies, and practices"). USTR explicitly tied the $200 billion in its proposed action to the level of retaliatory duties imposed by China on U.S. imports, noting that "action at this level is appropriate in light of the level of China's announced retaliatory action ($50 billion) and the level of Chinese goods imported into the United States ($505 billion in 2017)." *Id.; see also id.* (Because "China's retaliatory action covers a substantial percentage of U.S. goods exported to China ($130 billion in 2017)," "the level of the U.S. supplemental action must cover a substantial percentage of Chinese imports."). Although it pointed to China's retaliatory measures, USTR did not identify any increased burdens or restrictions on U.S. commerce resulting from the unfair practices that USTR had investigated. *See id.*

49. USTR's contemporaneous press statements corroborated the contents of its notice: China's retaliatory duties motivated its proposed action. Ambassador Lighthizer stated that the proposed action came "[a]s a result of China's retaliation and failure to change its practice." Office of the United States Trade Representative, *Statement by U.S. Trade Representative Robert Lighthizer on Section 301 Action* (July 10, 2018), *available at* *https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/july/statement-us-trade-representative#:~:text=Washington%2C%20DC%E2%80%93%20U.S.%20Trade%20Representative%20Robert%20Lighthizer%20today,on%20approximately%20%2434%20billion%20worth%20of%20Chinese%20imports*.

50. That same day, President Trump suggested via Twitter that the United States' trade imbalance with China supported the decision. @realDonaldTrump, Twitter (July 10, 2018, 9:17 PM EDT), https://twitter.com/realDonaldTnimp/status/1005982266496094209. Over the following weeks, President Trump also expressed his frustration over China's purported manipulation of its currency and national monetary policy, as well as his continued displeasure over China's retaliatory tariffs and the trade imbalance between the two nations. *See, e.g.*, @realDonaldTrump, Twitter (July 20, 2018, 8:43 AM EDT), https://twitter.com/realDonaldTrump/status/1020287981020729344; @realDonaldTrump, Twitter (July 20, 2018, 8:51 AM EDT), https://twitter.com/realDonaldTrump/status/1020290163933630464; @realDonaldTrump, Twitter (July 25, 2018, 7:20 AM EDT), https://twitter.com/realDonaldTrump/status/1022079127799701504?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1022079127799701504%7Ctwgr%5Eshare_3&ref_url=https%3A%2F%2Fdailycaller.com%2F2018%2F07%2F25%2Ftrump-china-vicious-trade-

tweet%2F; @realDonaldTrump, Twitter (July 25, 2018, 7:01 AM EDT), https://twitter.com/realDonaldTrump/status/1022074252999225344 .

51. Within days of these statements, Ambassador Lighthizer announced that, in light of China's retaliatory duties, USTR would propose to increase the additional duty from 10% to 25% *ad valorem.* Rather than addressing the practices that USTR investigated pursuant to Section 301 of the Trade Act, he stated that China "[r]egrettably . . . has illegally retaliated against U.S. workers, farmers, ranchers and businesses." Office of the United States Trade Representative, *Statement by U.S. Trade Representative Robert Lighthizer on Section 301 Action* (Aug. 1, 2018), *available at* https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/august/statement-us-trade-representative.

52. Shortly thereafter, USTR, at the direction of President Trump, formally proposed "raising the level of the additional duty in the proposed supplemental action from 10 percent to 25 percent." *Extension of Public Comment Period Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 38,760, 38,760 (Aug. 7, 2018). USTR also set new dates for a public hearing over six days ending on August 27, 2018. *See id.; see also* Office of the United States Trade Representative, *Public Hearings on Proposed Section 301 Tariff" List* (Aug. 17, 2018) (modifying hearing schedule), *available at* https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/august/public-hearings-proposed-section-301.

53. At the same time, USTR adjusted the deadlines for the submission of written comments, setting September 6, 2018—less than a month later—as the new deadline for both *initial and rebuttal* comments from the public. 83 Fed. Reg. at 38,761. That adjustment, deviating from its past practices, prevented both USTR and the public from considering initial comments at

the hearing, and left insufficient time for interested parties to review and respond to the initial comments filed by other parties. USTR also limited each hearing participant to five minutes. Docket No. USTR-2018-0026, https://beta.regulations.gov/document/USTR-2018-0026-0001. Despite those obstacles, approximately 350 witnesses appeared at the six-day hearing, and the public submitted over 6,000 comments. *Id.*

54. Just eleven days after receiving final comments from the public, President Trump announced that he had directed USTR "to proceed with placing additional tariffs on roughly $200 billion of imports from China." The White House, *Statement from the President* (Sep. 17, 2018) https://www.whitehouse.gov/briefings-statements/statement-from-the-president-4/. Once again, the President made clear that China's response to the $50 billion tariff action (i.e., List 1 and List 2 duties) motived his decision, and he immediately promised to proceed with "phase three" of the plan –an *additional $267 billion tariff action* – "if China takes retaliatory action against our farmers or other industries." *Id.*

55. Following the President's announcement, USTR published notice of the final list of products subject to an additional duty, a list commonly known as "List 3." 83 Fed. Reg. at 47,974. USTR imposed a 10% *ad valorem* tariff that was set to rise automatically to 25% on January 1, 2019. *Id.* USTR determined that the List 3 duties would apply to all listed products that enter the United States from China on or after September 24, 2018. *Id.* USTR did not respond to any of the over-6,000 comments that it received or any of the testimony provided by roughly 350 witnesses. *Id.*

56. As legal support for its action, USTR for the first time cited Section 307(a)(1)(B) of the Trade Act, which provides that USTR "may modify or terminate any action, subject to the specific direction . . . of the President . . . taken under Section 301 if . . . the burden or restriction on

United States commerce of the denial of rights, or of the acts, policies, or practices, that are the subject of such action has increased or decreased." *Id.* (brackets omitted). USTR stated that the relevant burden "continues to increase, including following the one-year investigation period," adding that "China's unfair acts, policies, and practices include not just its specific technology transfer and IP polices referenced in the notice of initiation in the investigation, but also China's subsequent defensive actions taken to maintain those policies." *Id.* USTR also cited Section 307(a)(1)(C) of the Trade Act, arguing that China's response to the $50 billion tariff action "has shown that the current action no longer is appropriate" because "China openly has responded to the current action by choosing to cause further harm to the U.S. economy, by increasing duties on U.S. exports to China." *Id.* at 47,975.

57. In the months that followed, China and the United States attempted to resolve their differences through trade negotiations. Based on the progress made with China in those negotiations, the Trump Administration announced in December 2018, and again in February 2019, that it would delay the scheduled increase in the List 3 duty rate from 10 to 25%. *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 65,198 (Dec. 19, 2018); *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 7,966 (Mar. 5, 2019).

58. The trade negotiations ultimately fell apart. In May 2019, USTR announced its intent to raise the tariff rate on List 3 goods to 25%, effective either May 10, 2019, or June 1, 2019, depending on the date of export. *See Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 20,459 (May 9, 2019) *("List 3 Rate Increase Notice"); see also Implementing*

*Modification to Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 21,892 (May 15, 2019). The notice cited China's decision to "retreat from specific commitments agreed to in earlier rounds" of negotiations as the basis for the increase in the duty rate. *List 3 Rate Increase Notice,* 84 Fed. Reg. at 20,459. Unlike with past imposition of new tariffs, USTR did not seek public comment but rather simply announced that the increase would occur. *Id.*

59. Recognizing that List 3 would cause substantial harm to U.S. companies and consumers, as well as the U.S. economy, USTR in June 2019 invited the public to seek exclusions from List 3 duties on a product-specific basis. *Procedures for Requests to Exclude Particular Products From the September 2018 Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 84 Fed. Reg. 29,576 (June 24, 2019). The three factors that USTR indicated would guide its adjudication of exclusion requests were: (1) Whether the imported products were only available from China or from U.S. suppliers or third countries; (2) Whether the duties would cause severe economic harm to the applicant; and (3) Whether the subject products were strategically important or related to "Made in China 2025" or other Chinese industrial promotion programs. *Id.*

60. The duties imposed on products covered by List 3 remain in effect as of the date of this Complaint, with the exception of the limited number of products for which USTR extended its originally granted exclusions from the List 3 duties. *See, e.g., Notice of Product Exclusion Extensions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 85 Fed. Reg. 48,600 (Aug. 11, 2020).

**D. EAS's Request for Exclusions from List 3 Tariffs**

61. On September 27, 2019, EAS submitted three requests for narrowly tailored exclusions from the additional duties of List 3, including for the Leap® pods filled with nicotine-containing e-liquids classified under 8543.90.8860, Leap® device kits (incomplete ENDS assemblies to be used with Leap® pods to form a ENDS device) classified under 8543.90.8850, and the proprietary Leap® pods (non-nicotine containing) classified under 8543.90.8850. EAS provided substantial support for its exclusion requests.

**1. The Record Supports the Conclusion that EAS's ENDS Imports Are Only Available in China and Not Available from Third Countries.**

62. ENDS products are considered to be "tobacco products" under the FDCA. Under the FDCA, no new ENDS products are allowed to be commercially marketed in the United States absent a premarket authorization from FDA, which requires the expenditure of millions of dollars to complete. Under FDA's enforcement policy, the only ENDS products that can currently be sold in the U.S. are those that already were on the market as of August 8, 2016, and for which a premarket application has been submitted to FDA. If an ENDS supplier were to use a different ingredient, additive, component, or material in the production of the product, the product would constitute a "new tobacco product," and the manufacturer would be required to file a new premarket authorization application under the FDCA. Thus, the manufacture and sale of any new or modified ENDS devices or parts in the United States are effectively banned in the United States.

63. EAS has been at the forefront of ensuring that its branded vapor products are marketed and distributed for the protection of the public health and has been advocating for ending youth access to ENDS products. It has invested millions of dollars to apply for the premarket authorization for its branded ENDS products that were on the market as of August 8, 2016, but

must continue to rely on Chinese imports for a continuous supply of the parts and components for these products.

64. The government's import data since 2017 demonstrates that Chinese imports of ENDS parts classified under 8543.90.8850 have represented from 96.32% to 99.97% of the global imports into the United States by value. The Chinese manufacturer for the proprietary Leap® pods sold by EAS is the sole manufacturer for these components. If EAS were to relocate its supply of these parts and components for its ENDS products, EAS would be required to apply for new marketing orders for these products. It is nearly impossible to replicate manufacturing operations for these components outside of China.

**2. Record Evidence Shows that the Imposition of List 3 Duties Causes Severe Economic Harm to EAS.**

65. In its exclusion requests, EAS submitted that it would incur millions of dollars of expenses in absorbing the tariffs and could lose a substantial portion of its sales if it were to increase prices to cover the cost of the tariff. Since the imposition of the tariffs, EAS has, in fact, paid millions of dollars in duties.

**3. The Record Supports the Conclusion that the Particular Products Are Not Strategically Important or Related to "Made in China 2025" or Other Chinese Industrial Programs.**

66. The record is clear that the industry for ENDS products is not a particularly high-tech industry. This industry is nowhere to be found in the "Made in China 2025" report, nor is it considered a "promoted" industry in any other Chinese industry policy statement or document.

67. Despite the foregoing, Defendants ignored the record evidence establishing that ENDS components imports are not available in the U.S. market, and instead issued a boilerplate denial to each and every one of EAS's exclusion requests that failed to address any of the record evidence and failed even to offer any reasoned basis for Defendants' decisions.

68. As a result, EAS has paid millions of dollars in tariffs from which it could—and should—have been exempted.

**COUNT ONE**
**(Declaratory Judgment)**

69. Paragraphs 1 through 68, above, are incorporated by reference as if repeated at length herein.

70. The Declaratory Judgment Act authorizes any court of the United States to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

71. The Trade Act of 1974 does not authorize the actions taken by Defendants that resulted in the List 3 tariffs.

72. Pursuant to Section 301 of the Trade Act, USTR may impose tariffs when it determines that "an act, policy, or practice of a foreign country is unreasonable or discriminatory and burdens or restricts United States commerce, and action by the United States is appropriate." 19 U.S.C. § 2411(b). USTR failed to predicate its action giving rise to the List 3 tariffs on any such determination.

73. If USTR concludes upon investigation that a foreign country maintains an unfair trade practice, Section 304 of the Trade Act requires USTR to "determine what action, if any," to take within "12 months after the date on which the investigation is initiated." 19 U.S.C. § 2414(a)(1)(B), (2)(B). USTR's action giving rise to the List 3 tariffs occurred in September 2018, over a year after USTR initiated the underlying Section 301 investigation on August 18, 2017.

74. Section 307 of the Trade Act authorizes USTR to "modify or terminate" an action taken pursuant to Section 301(b) of the Trade Act when the burden imposed on U.S. commerce from the foreign country's investigated unfair acts, policies, or practices increases or decreases. 19

U.S.C. § 2417(a)(1)(B). Section 307 of the Trade Act, however, does not permit Defendants to increase tariffs for reasons unrelated to the acts, policies, or practices that USTR investigated pursuant to Section 301 of the Trade Act. Congress did not authorize USTR to escalate its focused investigatory findings into an open-ended trade war.

75. Section 307 of the Trade Act also authorizes USTR to "modify or terminate" an action taken pursuant to Section 301(b) of the Trade Act if the initial action taken by USTR "is no longer appropriate." 19 U.S.C. § 2417(a)(1)(C). Section 307 of the Trade Act does not authorize Defendants to expand the scope of tariff actions that are no longer "appropriate," but rather only to modify or terminate such actions within the constraints of the authority empowered by Section 301 of the Trade Act.

76. Plaintiff is therefore entitled to a declaratory judgment that Defendants' actions giving rise to the List 3 tariffs are *ultra vires* and contrary to law. Defendants promulgation of the List 3 tariffs should thus be declared unlawful and Defendants required to refund to Plaintiff, with interest, all List 3 duties paid to date.

**COUNT TWO**
**(Violation of the Administrative Procedure Act – Promulgation and Imposition of List 3 Tariffs)**

77. Paragraphs 1 through 76, above, are incorporated by reference as if repeated at length herein.

78. The APA authorizes the Court to hold unlawful and set aside agency action that is: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; [or] (E) unsupported by substantial evidence." 5 U.S.C. § 706(2).

79. Defendants exceeded their authority under the Trade Act in promulgating List 3 and therefore acted "not in accordance with the law" and "in excess of statutory authority" for the reasons set forth in Count One.

80. Defendants failed to offer any evidence for any asserted "increased burden" from China's intellectual property policies and practices that were the subject of USTR's Section 301 investigation in establishing List 3.

81. Defendants also promulgated List 3 in an arbitrary and capricious manner and in violation of 5 U.S.C. § 553(b) because they did not provide a sufficient opportunity for comment, failed to meaningfully consider relevant factors when making their decisions, and failed to adequately explain their rationale. Defendants' preordained decision-making resulted in the unlawful imposition of tariffs on imports covered by List 3.

82. Defendants' promulgation of List 3 violated the APA's notice and comment requirements. The APA defines a "rule" as an "agency statement of general or particular applicability and future effect designed to implement . . . or prescribe . . . policy." 5 U.S.C. § 551(4); *see also Am. Frozen Food Inst., Inc. v. United States*, 18 CIT 565, 573, 855 F. Supp. 388, 396 (1994) ("[S]ubstantive or legislative-type rules are those which relate to and change the standards of conduct, and have force of law."). A "rule making," in turn, includes not only the initial issuance of new rules, but also the repeal or amendment of existing rules. 5 U.S.C. § 551(5). Under 5 U.S.C. § 553, all "legislative rules" must go through a mandatory notice and comment period process to be valid. Exceptions to the notice and comment requirement exist, however, for "interpretative rules" and "general statements of policy." 5 U.S.C. § 553(b). If a rule "adopts 'a new position inconsistent with' an existing regulation, or effects 'a substantive change in the regulation,' notice and comment are required." *U.S. Telecom Ass'n v. FCC*, 365 U.S. App. D.C.

149, 400 F.3d 29, 35 (D.C. Cir. 2005) (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100, 115 S. Ct. 1232, 131 L. Ed. 2d 106 (1995)) (emphasis omitted); *Tennessee Hosp. Ass'n v. Azar*, 908 F.2d 1029, 1042 (6th Cir. 2018) ("If an agency attempts to issue a legislative rule without abiding by the APA's procedural requirements, the rule is invalid.").

83. Defendants promulgation of the List 3 tariffs should thus be set aside and Defendants required to refund to Plaintiff, with interest, all List 3 duties paid to date.

**COUNT THREE**
**(Violation of the Administrative Procedure Act – Denial of EAS's Exclusion Requests)**

84. Paragraphs 1 through 68, above, are incorporated by reference as if repeated at length herein.

85. On September 27, 2019, EAS submitted Exclusion Request Nos. USTR-2019-0005-23575, USTR-2019-0005-26997, USTR-2019-0005-26998, seeking exclusions from Section 301 List 3 tariffs for certain ENDS components imported from China.

86. EAS submitted substantial evidence establishing that it was and remains entitled to the requested tariff exclusions based on the criteria the USTR set forth in its own exclusion procedures. *See Procedures for Requests To Exclude Particular Products From the September 2018 Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 29,576 (June 24, 2019). However, Defendants denied EAS's exclusion requests on May 4, 2020, without providing any reasoned basis for the adjudication.

87. The Defendants' decisions denying EAS's requests for exclusions from List 3 tariffs, without any evidentiary basis and without any expressed, reasoned basis for doing so, was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. The

denials were rendered "without observation of procedure required by law," and thus must be held "unlawful and set aside" by this Court. *Id.* § 702, 706.

88. The Court should set aside Defendants' denial of Plaintiff's exclusion requests and order Defendants to re-evaluate Plaintiffs' exclusion requests consistent with the criteria set forth in Defendants' own published procedures. Should Plaintiff's exclusion requests be granted, the Court should order Defendants to refund to Plaintiff, with interest, all List 3 duties paid to date.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully requests that this Court:

(1) declare that Defendants' actions resulting in tariffs on products covered by List 3 are unauthorized by, and contrary to, the Trade Act;

(2) declare that Defendants arbitrarily and unlawfully promulgated List 3 in violation of the APA;

(3) vacate the List 3 rulemakings;

(4) order Defendants to refund, with interest, any duties paid by Plaintiff pursuant to List 3;

(5) permanently enjoin Defendants from applying List 3 against Plaintiff and collecting any duties from Plaintiff pursuant to List 3;

(6) award Plaintiff their costs and reasonable attorney fees; and grant such other and further relief as may be just and proper.

In the alternative, if the Court finds that the List 3 is not unlawfully promulgated, Plaintiff respectfully requests that this Court enter judgment as follows:

(7) declare that Defendants' denials of EAS's exclusion requests were arbitrary and capricious or otherwise unlawful in violation of APA;

(8) order Defendants to re-evaluate Plaintiffs' exclusion requests consistent with the criteria set forth in Defendants' own published procedures and with the APA's requirements; and

(9) award Plaintiff their costs and reasonable attorney fees; and grant such other and further relief as may be just and proper.

Respectfully submitted,

THOMPSON HINE LLP

Dated: September 18, 2020

By: /s/ David M. Schwartz
David M. Schwartz
Eric Heyer
Meixuan Li
1919 M Street, NW
Washington, DC 20036
Phone: (202) 331-8800
Fax: (202) 331-8330

*Counsel to Plaintiff E-Alternative Solutions, LLC*

## CERTIFICATE OF SERVICE

Pursuant to U.S. Court of International Trade Rule 4(b) and (h), I hereby certify that on September 18, 2020, copies of Plaintiff's Summons and Complaint were served on the following parties by certified mail, return receipt requested:

Attorney-In-Charge
International Trade Field Office
Commercial Litigation Branch
U.S. Department of Justice
26 Federal Plaza
New York, NY 10278

Attorney-In-Charge
Commercial Litigation Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20530

General Counsel Joseph L. Barloon
Office of the General Counsel
Office of the U.S. Trade Representative
600 17th Street, NW
Washington, DC 20006

Chief Counsel Scott K. Falk
Office of Chief Counsel U.S.
Customs & Border Protection
1300 Pennsylvania Ave., NW
Washington, DC 20229

/s/ David M. Schwartz
David M. Schwartz